215 Cal.App.2d 560 (1963)
DiGIORGIO FURIT CORPORATION, Plaintiff and Respondent,
v.
AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS et al., Defendants and Appellants.
Civ. No. 10522. 
California Court of Appeals. Third Dist. 
Apr. 30, 1963.
 Charles P. Scully, Victor Van Bourg, Simonelli & Franzen and Nels Fransen for Defendants and Appellants.
 M. B. Plant, Brobeck, Phleger & Harrison, Leon E. Warmke and Warmke & Woodward for Plaintiff and Respondent.
 SCHOTTKY, J.
 Di Giorgio Fruit Corporation commenced an action against the AFL-CIO, an unincorporated association, Norman Smith, Louis Krainock, DeWitt Tannehill, Franz Daniel and the Agricultural Workers Organizing Committee, an unincorporated association, alleging that the said defendants had published a libelous film entitled "Poverty in the Valley of Plenty" and praying for compensatory and punitive damages. Issue was joined and the case was tried by the court sitting without a jury. The court found in favor of plaintiff and awarded plaintiff the sum of $100,000 as general damages and $50,000 as punitive damages. Defendants have appealed from the judgment entered in accordance with said findings.
 Appellants urge a number of contentions in arguing for a reversal of the judgment, but before discussing these we shall summarize the factual situation as shown by the record. As stated by appellants, "Although the trial in this matter was a lengthy one the facts presented by the record are substantially not in dispute."
 The Di Giorgio Fruit Corporation (hereinafter referred to as Di Giorgio) is primarily engaged in farming. It owns some 19,000 acres of agricultural land on which it produces various crops. On one specific tract of over 10,000 acres in California a particular combination of crops is raised which provides year-around employment for between 600 and 800 employees, and as many as 2,000 at the harvest season.
 The corporation provides living quarters on the ranch for some 120 families and rentals are a maximum of $10 a month. Single men are housed in dormitories some of which are made from old railroad refrigerator cars which have been remodeled. These have hot and cold water with modern bathing and toilet facilities. Board is also furnished the single men and they are charged $2.25 a day for room and board.
 There are schools in the vicinity. A medical facility is *566 maintained at which there is a registered nurse and a laboratory technician in full-time attendance. A doctor holds daily office hours at the facility. Recreation facilities are maintained for the use of the employees and their families.
 Thee facilities furnished today are approximately the same as those furnished by the corporation in 1948.
 In 1948 the National Farm Labor Union (now the National Agricultural Union) which was affiliated with the AFL endeavored to unionize the agricultural workers employed at the Di Giorgio farms. In support of that effort a sound motion picture film was produced entitled "Poverty in the Valley of Plenty" which purported to depict conditions at the Di Giorgio farms.
 The basis of the libel is the showing of this film. This film apparently shows that the agricultural workers at Di Giorgio farms live in what may be properly described as extremely substandard housing. The charge is made that there is no sanitation, that women have no laundry facilities, and that the workers live in one-room shacks which are frequently overcrowded. It is also charged that no medical facilities are furnished and that men are required to work 12 hours a day while they are paid for only 11 hours. It was also asserted that Di Giorgio employed persons who were smuggled across the border by "head hunters" employed by large farm interests.
 The charges contained in the film were found to be false. The shacks were not pictures of the housing on the Di Giorgio farms but rather were taken of houses in the surrounding countryside. The housing furnished had sanitation with modern kitchen, toilet and bathing facilities. Other charges contained in the film were also apparently false.
 In 1949 a bill was introduced in Congress seeking the repeal of the Taft- Hartley Act and the House Committee on Education and Labor held hearings on the matter. The National Farm Labor Union showed the committee "Poverty in the Valley of Plenty," and a special subcommittee was appointed to investigate the facts. The subcommittee held hearings at Bakerfield and took the testimony of numerous witnesses, including, among others, H. L. Mitchell, President of the National Farm Labor Union; Ernesto Galarza, Educational Director of the National Farm Labor Union; and C.J. Haggerty, Secretary- Treasurer of the State of California for the AFL. In February 1950 the subcommittee rendered its *567 report and concluded that the charges contained in the film, and hereinbefore enumerated, were false. The report was printed in the Congressional Record and a copy reposes in the library of the AFL-CIO Washington headquarters.
 In May 1950 a suit which had been filed by Di Giorgio against the union and certain of its officers for libel was settled. As part of the agreement the union confessed judgment and agreed to destroy all copies of the film in its possession and agreed to use its best efforts to induce third parties who had possession of the film to deliver up the film for destruction.
 In 1959 the executive council of the AFL-CIO decided to make another effort to organize farm workers. After a report from its department of organization, of which appellant Daniel was a member, the executive council authorized the commencement of such activities. The director of the department of organization placed appellant Smith in charge of the program. One Galarza was also appointed to assist Smith (Galarza had been one of the defendants in the prior action).
 The film was resurrected in 1960 and was shown at various places in Northern California. These showings were aimed primarily at agricultural workers, though the general public could and did attend.
 Appellants Krainock, Tannehill and Smith showed the film. Smith told the audience that the condition of agriculture workers was not much better than it was when the film was made and that it was substantially true. Tannehill had been told previously that conditions at the Di Giorgio farms were better than those shown in the film.
 The trial court found in substance:
 1. That the representations made in the film were false.
 2. That none of the appellants believed the representations to be true or had any reason to believe them to be true; on the contrary, appellants "were upon notice, and in fact knew, that the said defamatory statements were untrue."
 3. That appellants nevertheless represented all of the statements and representations made by the film to be true, excepting only that since the making of the film the law had been changed to require workmen's compensation insurance and to provide for limited social security benefits.
 4. That the film was published with actual malice and for the purpose of injuring respondent in its business and occupation. *568
 5. That the publication tended to injure, and in fact did injure, respondent in its business and occupation.
 Appellants' contentions are: (1) that the representations contained in the film related to Joseph Di Giorgio rather than respondent; (2) that the representations were true; (3) that a corporation is without reputation and therefore cannot recover in a libel suit; (4) that the publications were not libelous per se; (5) that they were privileged; (6) that in the case of appellant AFL-CIO the other appellants did not act as its agents in publishing the film; and (7) that punitive damages are not allowable and the damages are excessive.
 Before discussing the specific contentions of appellants, we deem it well to state that in a libel action arising out of a labor dispute a court is faced "with the difficult task of striking a balance between the fundamental social importance of preserving freedom for communication of opposing economic views and the public interest in establishing 'the limits of permissible contest open to industrial combatants.' " (Gilbert, Privileged Publications in Labor Disputes Under California Libel Laws (1956) 30 So.Cal.L.Rev. 36.)
 [1] The basic rules governing such cases are well expressed in the leading case of Emde v. San Joaquin County Central Labor Council, 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916], at pages 154-155, as follows:
 "Although the publicizing of the facts of a labor dispute in a peaceful manner is within the liberty of free discussion guaranteed by the Fourteenth Amendment to the United States Constitution, a party to the controversy has no absolute privilege to discuss such matters so as to avoid civil responsibility for injury to another caused by a malicious and false statement made in the course of the differences between them. (See Washer v. Bank of America, 21 Cal.2d 822, 832, 833 [136 P.2d 297].) [2] Because, however, the peaceful settlement of labor contention is a matter of vital public concern, the parties to such a controversy must be accorded the right to make fair comment upon the facts involved, at least so long as the criticism is based upon a true or privileged statement of fact. (See Snively v. Record Publishing Co., 185 Cal. 565 [198 P. 1]; 3 Rest., Torts, 606; 33 Am.Jur., Libel and Slander, 161, p. 155; for a discussion of the conflict as to whether the right of public discussion is limited to comment or opinion, or whether it in addition extends to false assertions of fact made with an honest belief in their truth, see Prosser *569 on Torts (1941) 94, pp. 839, 840; note, 10 So.Cal.L.Rev. 520, 521, 522; 33 Cal.Jur., Libel and Slander, 162, p. 156.) [3] Even greater protection is accorded one who makes a statement, in a reasonable manner and for a proper purpose, to persons having a common interest with him in the subject matter of the communication, when the publication is of a kind reasonably calculated to protect or further it. (Civ. Code, 47, subd. 3; 3 Rest., Torts, 596; Prosser on Torts, 94, p. 837; see also 3 Rest., Torts, 594, 595.) For this conditional privilege extends to false statements of fact, although the occasion may be abused and the protection of the privilege lost, by the publisher's lack of belief, or of reasonable grounds for belief, in the truth of the defamatory matter, by excessive publication, by a publication of defamatory matter for an improper purpose, or if the defamation goes beyond the group interest."
 Section 45 of our Civil Code defines libel as follows:
 "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."
 Section 45a states:
 "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. ..."
 [4] It is to be noted that an article libelous on its face, or libelous per se, is actionable without proof of special damage.
 [5] Appellants' first contention is that the film does not libel respondent corporation because it does not refer to respondent by name but refers to Joseph Di Giorgio. This contention is without merit. There is no requirement that the person defamed be mentioned by name. (Washer v. Bank of America, 21 Cal.2d 822 [136 P.2d 297].) It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff. (Brayton v. Crowell-Collier Pub. Co., 205 F.2d 644.) It is sufficient if the publication points to the plaintiff by description or circumstance *570 tending to identify him. (Peterson v. Rasmussen, 47 Cal.App. 694 [191 P. 30].)
 [6] Even though the corporation was not named and certain of the comments were directed to Joseph Di Giorgio, the founder, there is sufficient evidence to show that the remarks were directed to the corporation. There is in the sound track a reference to Joseph and then a statement that the other corporate farmers let him set the pace. Here an inference may be drawn that the farm is corporate property.
 The film does more than simply to locate the ranch and associate it with the name "Di Giorgio." It repeatedly refers to the ranch as being the property of a "corporation farmer" and of a "corporation," and it twice identifies the corporate owner (and hence the person at whom the defamatory accusations were directed) as the "Di Giorgio Corporation." The only part of respondent's name that is omitted is the word "Fruit."
 Appellants argue that because reference is made in the film to Joseph Di Giorgio the film defames only him. But the fact is that Joseph Di Giorgio is introduced as "the richest and most powerful of the corporation farmers" and that it is clear even from the references to Joseph Di Giorgio that the defamatory accusations are directed at the corporate owner of the ranch. From everything said and depicted we believe the trier of fact could determine that the film was depicting respondent corporation as well as Mr. Joseph Di Giorgio.
 [7] Appellants' second contention is that the representations contained in the film were true. This contention is so utterly devoid of merit that it is difficult to understand how appellants can urge it seriously. We have read the entire record and have seen and heard the film in controversy and are satisfied the evidence as hereinbefore summarized amply supports the findings of the trial court that the representations made in the film were false and that none of the appellants believed the representations to be true or had any reason to believe them true; on the contrary, appellants "were upon notice, and in fact knew, that the said defamatory statements were untrue."
 [8] Appellants' next contention is that a corporation is without reputation and therefore cannot recover in a libel suit. We do not agree. A defamatory publication is actionable if it "has a tendency to injure" the person to whom it refers "in his occupation." (Civ. Code, 45.) The code *571 draws no distinction in this respect between a natural person and a corporation, and we know of no authority that does. While a corporation has no reputation in the personal sense to be defamed by words, such as those imputing unchastity, which would affect the purely personal reputation of an individual, it has a business reputation, and language which casts aspersions upon its business character is actionable. (Prosser, The Law of Torts (2d ed.) 578-579; Newell, Slander and Libel (3d Ed.) 435; 1 Harper and James, The Law of Torts (1956) 361; Rest., Torts, 561(1); Utah State Farm Bureau Federation v. National Farmers Union Service Corp., 198 F.2d 20; Brayton v. Crowell- Collier Pub. Co., 205 F.2d 644; Den Norske etc. Actiesselskabet v. Sun Print. & Pub. Assn. (1919) 226 N.Y. 1 [122 N.E. 463]; Pennsylvania Iron Works Co. v. Henry Voght Mach. Co. (1906) 139 Ky. 497 [96 S.W. 551]; South Hetton Coal Co. v. North-Eastern News Assn. (1894) 1 Q.B. 133.) [9] A corporation's reputation as an employer is, of course, an important aspect of its business reputation. Thus, in South Hetton Coal Co. v. North-Eastern News Assn., supra, a corporate plaintiff was allowed recovery for representations that the cottages furnished its workmen were in a highly unsanitary state and were, for the most part, unfit for habitation because of absence of proper and decent conveniences, inadequate rooms and want of sufficient water supply.
 As is well said in the case of Axton Fisher Tobacco Co. v. Evening Post Co., 169 Ky. 64 [183 S.W. 269, at page 274, Ann.Cas. 1918C 560, L.R.A. 1916E 667]: "And so, when a corporation such as the Axton Fisher Tobacco Company charges that a publication respecting it is libelous per se, it is essential that it should reasonably and naturally appear from the publication complained of that it was of such a nature as to deprive [it] of the patronage or trade it enjoyed in a business way, or to render it so odious and contemptible in the estimation of those with whom it did have or might reasonably expect to have business dealings or connections as to injuriously affect its business. ..."
 "... If the publication is of such a nature as to reasonably and naturally render the corporation odious and contemptible in the estimation of the public or its patrons, and thereby deprive it of the favor and esteem of the public and the patronage and trade of its customers, its business may be as grievously injured and as seriously affected in a pecuniary way as *572 if it were directly charged with misrepresenting the quality of its products or the method by which its business was conducted. And so if the publication reasonably and naturally has the effect of bringing the business of the corporation into public contempt, and of making it odious in the estimation of those with whom it has business dealing or connections, then the law will presume that the publication was actionable per se without either pleading [or] proof of special damage. It will be inferred that the publication did injure it in a business way, for it is only in a business way, resulting in pecuniary loss, that a corporation can be damaged by an alleged libelous publication. Newell on Slander and Libel, p. 84; Townsend on Slander and Libel, p. 279; ..."
 [10] In the case at bench the record shows, and the court found, inter alia: "The said 'Poverty in the Valley of Plenty' falsely and maliciously charges as follows: That plaintiff as an employer mistreats and has mistreated its employees at Di Giorgio Farms in the respects described in said film and sound track; that plaintiff denies and has denied to said employees rights and opportunities granted to all other industrial workers; that plaintiff refuses and has refused its said employees accident insurance protection; that plaintiff robs and has robbed its said employees and their families to an unbelievable extent of many normal American human rights; that plaintiff is, and has been, less considerate of its said employees than of its farm tools and equipment; that the living conditions of plaintiff's said employees are, and have been, in most instances, worse than those portrayed in 'The Grapes of Wrath;' and that plaintiff's employees are, and have been, working under conditions that were prevalent at the end of the Civil War. ..."
 "... [P]laintiff provides its non-supervisory employees and their families with living accommodations on Di Giorgio Farms consisting of unpainted, ramshackle structures exposed to wind and weather, lacking in ordinary sanitary facilities and in the utility services commonly provided for living quarters and being of a generally squalid character, unsuited for human habitation;"
 "* * *"
 "That the said living accommodations now and heretofore furnished by plaintiff to its said non-supervisory employees are such that frequently nine or ten people live in a one-room shack, where they cook, eat and sleep, and in which *573 there is no sanitation; and that in connection therewith twenty-five or thirty families use a cold water shower, next to a cow pen;"
 "* * *"
 "That plaintiff has required, and now requires, certain of its said non- supervisory employees to work twelve hours for eleven hours' pay;"
 "* * *"
 "That plaintiff has participated with others in the smuggling of Mexican nationals into this country, and has employed Mexican nationals delivered to plaintiff at a fixed price per head, knowing that said Mexican nationals were illegally in the country, all in violation of the criminal statutes of the United States."
 Such statements as the court found to be falsely and maliciously made must be held to be libelous per se and were statements which would necessarily be damaging to the respondent corporation's reputation as an employer and to its general business reputation. The defamatory accusations were plainly directed at the owner of the Di Giorgio farms which the film itself identified as the "Di Giorgio Corporation." While the film contained references to "corporate farmers" in general and to "other corporate farmers," this does not alter the fact that it was respondent which was held up as the horrible example and which was the specific target of the film's accusations.
 [11a] Appellants' next major contention is that "Assuming, for the purposes of argument only, that the depiction of the Film may have been otherwise libelous, it is clear that each of the publications was insulated by a qualified privilege because none of the showings was made except to farm workers, to Union members and to potential Union members and to a handful of equally interested, though uninvited, growers, growers' representatives and labor contractors." They quote subdivision 3 of section 47 of the Civil Code as follows:
 "A privileged publication or broadcast is one made--"
 "3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."
 The trial court found also that, "At all times herein mentioned *574 each of the said defendants was lacking in any belief in the truth of the defamatory statements published as aforesaid and was without any reasonable grounds for believing the same or any of them to be true. The said defendants were upon notice, and in fact knew, that the said defamatory statements were untrue. Nevertheless, the said defendants, in and when showing and publishing said film, represented that all of the statements and representations made therein were true excepting only that since the making of the film, the law had been changed to require workmen's compensation insurance to provide for limited social security benefits."
 "The said defendants, and each of them, published the said defamatory statements and representations of and concerning said plaintiff with actual malice and with wanton and reckless heedlessness of plaintiff's rights, and with the intent and purpose of exposing plaintiff to hatred, contempt, ridicule and obloquy, and for the purpose of injuring plaintiff in its said business and occupation."
 [12] There was evidence in the record that the California Federation of Labor (the official state branch of the American Federation of Labor) had knowledge of the prior libel suit and the settlement under which the film was to be destroyed. Smith was aware of the background of the film and knew it was not supposed to be shown. In addition, Smith and Tannehill were told the conditions at Di Giorgio farms were good. None of those who had shown the films had ever investigated the conditions at Di Giorgio. The trier of fact could find that none of the appellants had any reasonable grounds for believing the representation was true and this would support the finding of malice.
 The record amply supports the findings of the trial court that appellants were "lacking in any belief in the truth of the defamatory statements," were "without any reasonable grounds for believing the same or any of them to be true," and "were upon notice, and in fact knew, that the said defamatory statements were untrue," and the further finding that said statements were published with actual malice.
 [13] As stated in 1 Harper and James, The Law of Torts, at page 452: "Of course, if a person making such a statement knows, at the time, that he is lying, no further evidence of malice is necessary."
 [14] Prosser in his works on torts, 2d edition, states at page 628: "[I]t appears that the privilege is lost if the *575 publication is not made primarily for the purpose of furthering the interest which is entitled to protection. ..."
 [15] Both authorities and the Restatement of the Law of Torts ( 600) state that the privilege is lost if the publisher does not believe in the truth of the defamatory matter or ( 601) has no reasonable grounds to believe in it.
 [16] The California rule is well stated in Emde v. San Joaquin County Central Labor Council, supra (23 Cal.2d 146), at page 154 as follows: "Although the publicizing of the facts of a labor dispute in a peaceful manner is within the liberty of free discussion guaranteed by the Fourteenth Amendment to the United States Constitution, a party to the controversy has no absolute privilege to discuss such matters so as to avoid civil responsibility for injury to another caused by a malicious and false statement made in the course of the differences between them. (See Washer v. Bank of America, 21 Cal.2d 822, 832, 833 [136 P.2d 297].)" (See also Brewer v. Second Baptist Church, 32 Cal.2d 791 [197 P.2d 713].)
 In Washer v. Bank of America, supra, the court said malice may be inferred from the fact that the publisher had no probable cause for believing the truth of the statement. Thus, the claim of privilege would be defeated in such a situation.
 [11b] The case at bench is not a case such as Emde v. San Joaquin County Central Labor Council, supra, involving merely bona fide expressions of opinion; this is a case involving knowing and deliberate falsification of facts, and to say that the publications were privileged would be to say that a labor organization in achieving its ends has an unbounded license to defame.
 [17] Appellant AFL-CIO makes the further contention that there is no fact in the record to support a finding that the Agricultural Workers Organizing Committee, or any of the persons connected with it, acted as the agent or representative of defendants AFL-CIO and Franz Daniel. This contention cannot be sustained.
 Smith was a salaried employee of the AFL-CIO. He was authorized and directed by it to put on a campaign to organize California farm workers and was given carte blanche authority to proceed as he might see fit. He employed others to assist him, their salaries and expenses being paid with funds supplied for the purpose by the AFL-CIO. Smith and his assistants were known as the Agricultural Workers Organizing *576 Committee, which was simply an organizing committee of the AFL-CIO. In the course of the campaign, and in furtherance of its purpose, Smith procured a copy of "Poverty in the Valley of Plenty" and he and his assistants showed it at the various meetings.
 This testimony was confirmed by Franz Daniel, the Assistant Director of Organization of the AFL-CIO. This evidence is sufficient to establish the fact of agency. [18] The testimony of the agent himself was sufficient at least where it rests in parol (see Sokolow v. City of Hope, 41 Cal.2d 668 [262 P.2d 841]; Rest. 2d Agency, 285, rep. notes), and the testimony of the agent is sufficient to establish the extent and authority of the agent. (Sierra Paper Co. v. Mesmer, 45 Cal.App. 667 [188 P. 605]; Kast v. Miller & Lux, 159 Cal. 723 [115 P. 932].) [19] A master is subject to liability from defamatory statements made by an agent acting within the scope of his authority. (Draper v. Hellman Coml. T. & S. Bank, 203 Cal. 26 [263 P. 240]; Rosenberg v. J. C. Penney Co., 30 Cal.App.2d 609 [86 P.2d 696]; Rest. 2d Agency, 247.)
 Appellants' final contentions are that "Damages in this case are excessive and not supported by the record even if it were to be found that these defendants are otherwise liable," and that "punitive damages should not have been assessed in this case."
 Appellants argue that "there could not have been any pecuniary damage to it since persons and customers with which it deals as a corporate entity were not viewers of the Film and the financial condition of the corporation improved in the applicable period." Appellants assert that the finding of $100,000 as general damages is excessive, speculative and based upon the bias, passion and prejudice of the trial court and simply has no relation to the facts in the record.
 As hereinbefore set forth, the trial court awarded the sum of $100,000 as general damages and the sum of $50,000 as punitive or exemplary damages.
 [20] The rule as to general or compensatory damages is well stated in Restatement of the Law of Torts, section 621, as follows:
 "One who is liable for a libel or for a slander actionable per se is liable for harm caused thereby to the reputation of the person defamed or in the absence of proof of such *577 harm, for the harm which normally results from such a defamation."
 "Comment:"
 "a. Meaning of general damages. General damages are a form of compensatory damages. They are imposed for the purpose of compensating the plaintiff for the harm which the defamatory publication is proved, or, in the absence of proof, is assumed to have caused to his reputation. It is not necessary for the plaintiff to prove any specific harm to his reputation or any other loss caused thereby. Indeed, in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed. If the plaintiff is able to show a particular pecuniary loss resulting from the defamatory publication, he may recover for the special harm thus caused under the rule stated in section 622. If, however, he is unable to show such definite loss, but the defamatory publication is of such kind and was published under such circumstances as to justify the inference of some general impairment of his reputation or, through loss of reputation, to his other interests, he is entitled to recover general damages therefor."
 And as stated in 33 American Jurisprudence at page 263: "The general rule is that the victim of a defamation which is actionable per se can recover the general damages without proof of loss or injury which is conclusively presumed to result from the defamation. He is not required, in order to recover the general damages, to make proof of any special damages that may have accompanied them, although he is at liberty to prove them if he desires. ..."
 [21a] We have hereinbefore held that appellants were guilty of libel per se and that one guilty of a libel per se is liable to the person libeled for at least nominal damages. Respondent was not required either to allege or prove special damages in order to recover general damages, and in the case at bench respondent did not allege special damages and introduced no evidence of special damages. Appellants argue that there was no pecuniary damage to respondent "since persons and customers with which it deals as a corporate entity were not viewers of the Film." Respondent in reply states that "It is immaterial that the film was not shown to respondent's customers; it was shown to agricultural workers, where an attack upon respondent's character as an employer was likely to do the greatest damage." It appears from the *578 record that respondent's primary business is that of farming. It owns 19,068 acres of agricultural land in California upon which it produces grapes, plums, pears and other deciduous fruits, and also asparagus and various annual crops such as potatoes, peanuts, cotton and grain. It also owns 5,282 acres of agricultural land in Florida upon which it produces citrus fruits.
 In addition to farming, respondent, either by itself or through wholly owned subsidiaries, produces box shook, produces and distributes wines, and processes and distributes various agricultural products grown by others. Year-around employment is provided for a regular work force of between 600 and 800 employees. During that season of the year when fresh fruit is being harvested and packed the number of persons employed is 1,600 to 2,000, but this seasonal accretion to the work force is made up largely of wives and other members of the families of regular year-around employees and of other permanent residents of the area.
 The film "Poverty in the Valley of Plenty," upon the showing of which the libel action is based, was shown almost daily during the months of April and May at meetings held in various places in Northern California, including Stockton, Marysville, Olivehurst, Woodlake, Riverbank, Empire, Reedley, Strathmore and Westley. These meetings, while held primarily for agricultural workers, were open to anyone who might care to attend, and at least some of them were attended by persons other than agricultural laborers. As Smith put it, the meetings were designed primarily to "educate" the worker, but "if any members of the public happen to be present, it will spill over to them."
 Taking into consideration the nature and extent of the business of respondent corporation, the fact that the film was shown primarily to agricultural workers in rural areas, and the further fact that no special damages were alleged or proven the award of $100,000 as general damages impresses this court as being excessive. While it is true that respondent was not required to prove special damages in order to be entitled to an award of general damages, and while it is also true that the amount of damages recoverable in such a case is ordinarily peculiarly a matter for the trial court, we cannot escape the conclusion that an award of $100,000 as general damages in the case at bench is grossly excessive. Of course, respondent was entitled to general damages, but in the absence of any proof of special damages, we believe the principal damage *579 that could reasonably accrue to respondent from the showing of the film would be damage to its reputation as an employer which would make it more difficult to secure farm laborers.
 [22] As this court said in Rosenberg v. J. C. Penney Co., 30 Cal.App.2d 609 [86 P.2d 696], at page 628: "In considering whether or not the awards were excessive, we realize the very familiar rule that to the jury, to a very large extent, is committed the responsibility of awarding compensation for an injury sustained. When the award, as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice, the duty is then imposed upon the reviewing court to act. ..."
 And as the court said in Maytag Co. v. Meadows Mfg. Co., 45 F.2d 299, at page 303: "The amount of damages recoverable in such cases as this is, ordinarily, peculiarly a matter for the jury, and where the court sits as a jury the only question arising is whether there has been anything other than the exercise of sound discretion. There can be no fixed or mathematical rule upon the subject. The master was bound to consider the notoriety given to the defamatory charge, the nature of the statements made and the character, condition, and influence of the parties. The damages are general in character, and specific instances of loss are not dependable standards of measurement. The general nature and extent of the business of appellee and its prospective damages, likely to result from the act of the defendant, were material circumstances. In short, the amount of damages lay within the sound discretion of the master, considering all of the circumstances of the case."
 "However, if the award is so great that it may be reasonably presumed that the master did not exercise such discretion, the court should treat the damages as excessive. ..."
 [21b] We are loath to interfere with the finding of a trial court, but considering all of the circumstances and evidence in the case at bench, we feel that the award of $100,000 as general damages is excessive as to any amount in excess of $10,000.
 [23] Appellants also attack the award of $50,000 as punitive or exemplary damages. Appellants argue that punitive damages must be based upon malice in fact and that malice in fact must be expressly proved and cannot be presumed. *580 Appellants assert that malice in fact was not proved in the case at bench and that punitive damages should not have been assessed.
 However, as hereinbefore pointed out, the trial court found that appellants made the false and defamatory "statements and representations of and concerning said plaintiff with actual malice and with wanton and reckless heedlessness of plaintiff's rights, ..." The record supports this finding of the trial court, and it was for the trial court to determine if punitive damages should be awarded and, if so, what the amount thereof should be.
 Section 3294 of our Civil Code states: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."
 [24] Section 908 of Restatement of the Law of Torts states:
 "(1) 'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct."
 [25] "(2) Where punitive damages are permissible, their allowance and amount are within the discretion of the trier of fact. In assessing such damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff which the defendant caused or intended to cause, and the wealth of the defendant."
 [26a] The libel in the case at bench was of an extremely aggravated nature. A film which had been condemned by a responsible committee of Congress as a falsification of facts and which had been the subject of a lawsuit and settlement under which it was never to be shown again was nevertheless resurrected and shown. As hereinbefore stated, the court found that appellants made the false and defamatory statements and exhibited the film "with actual malice and with wanton and reckless heedlessness of plaintiff's rights, ..." As shown by the record the appellant AFL-CIO was the association which authorized and financed the campaign to organize farm workers, a part of which was the showing of the film "Poverty in the Valley of Plenty." The AFL-CIO is a large and wealthy organization with annual receipts of nearly $9,000,000 and with net assets of over $5,000,000, of which approximately *581 $2,000,000 is in cash and government bonds.
 [27] What was said by our Supreme Court in Scott v. Times- Mirror Co., 181 Cal. 345 [184 P. 672, 12 A.L.R. 1007], at page 367, can well be applied to the present case: "In the matter of punitive damages it is clear from the authorities that juries have a wider discretion in this regard than they have in the matter of compensatory damages. (Voltz v. Blackmar, 64 N.Y. 440; Day v. Woodworth, 13 How. (U.S.) 363 [14 L.Ed. 181, see also Rose's U.S. Notes]; Bennett v. Hyde, 6 Conn. 24; Hayner v. Cowden, 27 Ohio St. 292 [22 Am. Rep. 303]; McConnell v. Hampton, 12 Johns. (N.Y.) 234.) In Luther v. Shaw, 157 Wis. 234 [147 N.W. 18], the court in affirming the award of punitive damages said: 'Where the jury are properly given such broad discretion with reference to exemplary damages, as indicated by the code of instructions whereby they were told they might assess against the defendant a sum which they deemed just and proper, and best calculated to be an example to him and to others, such jury are entitled to observe these instructions in good faith as meaning just what they said. How, then, can it be said that their verdict is perverse? They disregarded no evidence and violated no instructions in fixing these exemplary damages. Their estimates of what would be sufficient as a punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them in the language of this instruction to fix such sum which expressed their judgment in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed.'"
 "We cannot say upon the record before us that the damages awarded by the jury, either actual or punitive, have been given under the influence of passion or prejudice, and hence the award cannot be disturbed."
 [26b] Taking into consideration the facts and circumstances of the case at bench, as hereinbefore set forth, we do not believe that the award of $50,000 punitive damages can be declared to be excessive or that it can be held that such award was the result of passion or prejudice.
 The judgment is modified by reducing the award of $100,000 *582 as general damages to $10,000, and as so modified the judgment is affirmed. The parties are to bear their own costs of appeal.
 Pierce, P. J., and Friedman, J., concurred.