**TRANS WORLD ACCOUNTS, INC., a California Corporation, Plaintiff,**

v.

**The ASSOCIATED PRESS et al., Defendants.**

**No. C–75–1166 WWS.**

United States District Court,
N. D. California,
Civil Division.

Jan. 31, 1977.

L. Lawrence Bernheim, Spridgen, Barrett, Achor, Luckhardt, Anderson & James, Santa Rosa, Cal., for plaintiff.

David E. Monahan, Gray, Cary, Ames & Frye, San Diego, Cal., for defendant Copley Press, Inc.

Rogers & Wells by Richard N. Winfield and Donald F. Luke, New York City, for Associated Press.

Baker, Hostetler & Patterson, by Bruce W. Sanford and Lawrence V. Lindberg, Cleveland, Ohio for United Press International.

Arthur B. Dunne, Robert M. Dunne, Dunne, Phelps & Mills, San Francisco, Cal., for defendants Associated Press and United Press International, Inc.

## ORDER GRANTING AND DENYING MOTIONS FOR SUMMARY JUDGMENT

SCHWARZER, District Judge.

This is an action for defamation arising out of erroneous reports published by defendants of a complaint against plaintiff proposed to be issued by the Federal Trade Commission (FTC). Plaintiff Trans World Accounts, Inc. is a corporation conducting debt collecting and other operations in California and elsewhere. On January 3, 1975, the FTC distributed a press release announcing that it intended to issue complaints against Trans World and seven other debt collecting companies charging certain unfair and deceptive practices, namely (1) the use of collection forms appearing to be urgent telegraphic messages, (2) the use of forms falsely stating that legal action was about to be instituted, (3) the use of letters threatening debtors with damage to their credit ratings unless bills were promptly paid, and (4) falsely holding themselves out as bona fide collection agencies when in fact the companies were only mailing services engaged in sending out form messages to debtors.

The FTC release indicated that the third and fourth of the above charges were not being made against plaintiff Trans World, but only against certain of the other proposed respondents. The relevant portion of the press release stated:

"With the exception of Continental Collection Service and Trans World Accounts, Inc., all of the complaints allege that, contrary to fact, respondents represented that the debtor's general credit record would be adversely affected if the alleged debt is not paid.

Other typical allegations in the proposed complaints, with the exception of Power's Service, Inc., and Trans World Accounts, Inc., are that, contrary to representation:

. . . proposed respondents' businesses are not collection agencies, and

. . . alleged delinquent debts are not referred by creditors for collection by proposed respondents."

Nevertheless, one of three different dispatches prepared by the Washington Bureau of Associated Press (AP) reporting the FTC press release failed to indicate that not all of the eight companies named in the proposed complaints were charged with all of the unfair conduct described in the dispatch. Similarly the dispatch prepared by United Press International (UPI) reporting the press release failed to distinguish between the charges against Trans World and those against the other companies.

The San Diego Union and the San Diego Evening Tribune, both owned by Copley Press Inc., published news stories based on the AP and UPI dispatches in which Trans World was lumped with the other companies as the object of all of the charges in the proposed complaint.

Plaintiff demanded that AP and UPI publish corrections. Both wire services did so, but AP's correction was untimely under the California correction statute, Cal.Civil Code § 48a. Trans World also demanded a correction from the newspapers. The San Diego Union published a correction within the statutory time limit; The Evening Tribune's correction was untimely.

On May 6, 1975, Trans World filed an action for libel in the San Francisco Superior Court against AP, UPI and Copley Press, seeking general, special and punitive damages. It was subsequently removed to this Court which has jurisdiction based on diversity of citizenship. The defendants have now moved for summary judgment.

818

## I.

■ California law defines libel as a false and unprivileged publication which exposes a person to contempt, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation. Cal.Civil Code § 45. The protection afforded by California libel law extends to corporations as well as to individuals. A corporation may recover for defamatory statements having "a tendency to directly affect [its] property . . . or occasion it pecuniary injury." *Western Broadcast Co. v. The Times-Mirror Co.*, 14 Cal.App.2d 120, 57 P.2d 977 (1936); *Daniels v. Sanitarium Assoc., Inc.*, 59 Cal.2d 602, 30 Cal.Rptr. 828, 833, 381 P.2d 652 (1963); *Di Giorgio Fruit Corp. v. American Federation of Labor*, 215 Cal.App.2d 560, 30 Cal.Rptr. 350 (1963). The Restatement of Torts states the applicable rule as follows:

> "One who falsely, and without a privilege to do so, publishes of a corporation for profit matter which tends to prejudice it in the conduct of its trade or business or to deter third persons from dealing with it, is liable to the corporation . ." Sec. 561.

■ California law provides that statements made in the proper discharge of an official duty, in the course of official proceedings or in fair and true reports in a public journal of such proceedings or of public meetings are absolutely privileged. Communications between persons having an interest in the subject made without malice are also privileged. But other libelous communications subject the persons making the publication to liability without regard to fault. A plaintiff, whether a natural person or a corporation, may recover general, special and exemplary damages, except that in cases against newspapers only special damages may be recovered if a correction is demanded and published within the time provided. Cal.Civil Code, §§ 47, 48a. In view of the disposition of this case, it is not necessary to decide whether the correction provisions apply to AP and UPI.

■ Inasmuch as the publication here was one which may be found to be defamatory and which does not fall within any of the privileges recognized by California law, Trans World has stated a claim for libel upon which defendants could be held liable at least for special damages and, in the case of The Evening Tribune and AP, for general and exemplary damages.

## II.

Until the decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), libelous publications were considered to be "a class of speech wholly unprotected by the First Amendment . . ." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 370, 94 S.Ct. 2997, 3022, 41 L.Ed.2d 789 (1974). In *New York Times*, the Court began the process of reconciling the interest in reputation with the interest in free speech by holding that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." 376 U.S. at 283, 84 S.Ct. at 727. In such cases, the Court held, the First Amendment bars recovery except where the statement is found to have been made with actual malice—with knowledge or reckless disregard of its falsity. *Id.* at 279–280, 84 S.Ct. 710.

In *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended the protection afforded by *New York Times* to cases involving public figures, i. e. persons who, although not government officials, are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C. J., concurring in result).

In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality opinion of the Court sought to extend the *New York Times* rule to any utterance concerning "a matter . . . of public or general interest," whether involving a private or a public individual. *Id.* at 43, 91 S.Ct. at 1819. But three years later, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court reverted to the test laid down by its prior decision, based on the

status of the plaintiff as a public official or public figure and articulated as follows:

"That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." 418 U.S. at 351, 94 S.Ct. at 3012.

█ The instant motion requires the Court to determine the First Amendment standard applicable where the plaintiff is a corporation rather than a natural person. Only one reported decision appears to have considered the issue. *Martin Marietta Corp. v. Evening Star Newspaper,* 417 F.Supp. 947 (D.D.C.1976). In that case, the court held that the rule in *Rosenbloom v. Metromedia, Inc.,* above, should apply to corporations because "the values considered important enough to merit accommodation with interests protected by the first amendment are associated solely with natural persons, and that corporations, while legal persons for some purposes, possess none of the attributes the Court sought to protect." *Id.* at p. 955.[1]

This Court disagrees with that reasoning for two reasons. First, the Supreme Court in *Gertz* rejected *Rosenbloom* without qualification. It did so because the *Rosenbloom* formulation would unduly abridge the state interest in protecting the reputation of private individuals and because it would create additional difficulty by requiring courts to make ad hoc determinations whether publications address issues of "general and public interest." 418 U.S. at 346, 94 S.Ct. 2997; see also, *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). Second, at least in this case governed by

California substantive law, there is no distinction between the protectible interest in reputation of corporations and individuals and the former as much as the latter may recover special, general and punitive damages. *DiGiorgio Fruit Corp. v. American Federation of Labor,* 215 Cal.App.2d 560, 30 Cal.Rptr. 350, 355–356 (1963); compare *Martin Marietta Corp. v. Evening Star,* above, at 955.

While it is true that the Supreme Court's opinions in these cases have been cast in terms of protecting the rights of individuals, it is also true that the line between the interests of natural persons and corporations is frequently fuzzy and ill-defined. Various legal considerations have long led to the incorporation of businesses that are in economic reality but individual proprietorships or partnerships. On the other hand, very large business enterprises may be conducted as individual proprietorships or partnerships. For that additional reason, it seems that for purposes of applying the First Amendment to defamation claims, the distinction between corporations and individuals is one without a difference.

The court in *Martin Marietta* rested its holding on the alternative ground that Martin Marietta was a public figure under the *Gertz* standard. The article at issue there dealt with entertainment by defense contractors of government officials. Martin Marietta was a major defense contractor which had entertained government officials. Thus the court reasoned that it had thereby thrust itself into a matter of public controversy and had become a public figure for purposes of the issues involved.

Trans World is in a different position. It cannot be said to have become a public figure by having achieved "pervasive fame or notoriety." Nor can it be said that it "voluntarily inject[ed] [it]self . . . into a particular public controversy." But *Gertz* recognizes that a person may become a public figure for a limited range of issues

---

1. In *United Medical Laboratories v. Columbia Broadcasting System,* 404 F.2d 706 (9th Cir. 1968), this Circuit appears to have arrived at the same result but inasmuch as the decision

predates *Rosenbloom* and *Gertz,* above, and *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), it does not dispense with the analysis undertaken in this opinion.

by having been "drawn into a particular public controversy."

■■■ Neither the mere involvement in litigation nor the associated publicity where the participants attract public interest is sufficient to turn litigants into public figures. *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 965–966, 47 L.Ed.2d 154 (1976). But as the Court there recognized, "participants in some litigation may be legitimate 'public figures,' either generally or for the limited purpose of that litigation . . ." *Id.* 96 S.Ct. at 966–967. The litigation in this case was not a controversy between private parties nor simply an action by the government over an issue essentially of concern only to the government and the respondent. Instead, the proposed complaint which was the subject of the publication here was the result of an investigation into Trans World's business activities and reflected a determination that some of those activities created a sufficient risk of harm to a significant segment of the public that enforcement proceedings should be instituted.

The proposed complaint was issued under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which charges the FTC with the responsibility of protecting the public against unfair and deceptive trade practices. One of the FTC's functions under it is to investigate various trades and businesses to ascertain whether the public interest requires protective action. When there is reason to believe that violations of law may be occurring, the Commission will issue a proposed complaint with a notice that the complaint will be filed and proceedings commenced unless the proposed respondents agree to discontinue the challenged practices. 15 U.S.C. § 45, 16 C.F.R. §§ 2.31, 2.32. An integral feature of the Commission's enforcement effort is the publicity which attends the issuance of proposed complaints. By means of that publicity, the Commission not only seeks to warn the consuming public against possible harmful practices but it seeks to induce respondents to agree promptly to remedial orders without the necessity of extended legal proceedings.

The issuance of a proposed complaint in these circumstances thus draws the named respondent into a particular public controversy. By reason of practices and activities it has voluntarily undertaken, the respondent becomes the subject of an enforcement effort aimed not only at ending such practices and activities as may be found to be unlawful but at alerting the public against them. Reports by the media of FTC enforcement actions are an integral part of that enforcement effort. As the court stated in *F.T.C. v. Cinderella Career and Finishing Schools, Inc.*, 131 U.S.App.D.C. 331, 404 F.2d 1308 (1968), in an opinion upholding the FTC's press release procedure, "If the unsophisticated consumer is to be protected in any measure from deceptive or unfair practices, it is essential that he be informed in some manner as to the identity of those most likely to prey upon him utilizing such prohibited conduct. Certainly advice through news media as to the actions being taken by a government agency in his behalf constitutes a prophylactic step addressed ultimately to the elimination of the conduct prohibited by the statute." *Id.* at 1314.[2]

---

2. In another context—the protection afforded by the First Amendment to true reports of judicial proceedings which may invade an individual's privacy—the Supreme Court commented on the importance of the role of the press in reporting government activities:

"In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491–492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975); see, also, *Rosenbloom v. Me-*

Trans World may not have been a "public figure" until the proposed complaint issued but when it did it was clearly drawn into a particular controversy having its origin in Trans World's own conduct and activities and thereby became a public figure for the limited range of issues relating to the FTC's complaint. The defendants' publication, derived from the press release issued by the FTC as a part of its enforcement effort, reported on alleged practices of Trans World which the FTC considered to create a sufficient risk of harm to the public to warrant issuance of a complaint and public notice.[3]

In those circumstances, it seems to the Court that the principles underlying *New York Times* and its progeny compel extension to defendants of the protection afforded to reports of public figures.[4]

### III.

Having concluded that plaintiff falls within the *New York Times* rule as articulated in *Gertz*, the question is whether plaintiff on this motion has established the existence of a genuine issue of material fact with respect to whether the publications complained of were made with actual malice, i.e. with knowledge of their falsity or with reckless disregard of whether they were false or not. See 376 U.S. at 279–280, 84 S.Ct. 710.

As to AP and UPI, plaintiff advances four arguments: (1) that the coincidence of both wire services committing the same er-

ror with respect to the FTC press release is evidence of a conspiracy between them to libel plaintiff; (2) that the wire service had "knowledge of the falsity" since they had the accurate FTC press release before them; (3) that AP and UPI should have independently verified the statements and not relied solely upon the press release; and (4) that summary judgment is inappropriate with respect to AP and UPI since they may be held vicariously liable if it can be proved that Copley Press published the false story with actual malice.

With respect to the first contention, there is absolutely no evidence that AP or UPI conspired to prepare a false story about Trans World. For the Court to conclude that there is a genuine issue with respect to such a conspiracy would require it to ignore the sworn and uncontradicted affidavits of the AP and UPI personnel in which the reporters who wrote the dispatches at issue here detailed the procedures which they used in writing them. None of the reporters consulted with their counterparts at the rival news service.

As to plaintiff's second argument, while it is true that AP and UPI personnel did have copies of the FTC press release, there is no evidence that the dispatches were prepared so as to deliberately falsify the allegations against Trans World. The sworn, uncontradicted affidavits of wire service reporters show that they attempted to prepare an accurate summary of the FTC release and did not deliberately

---

*tromedia, Inc.,* above, 403 U.S. at 61, 91 S.Ct. 1811 (White, J. concurring in the judgment).

**3.** The circumstances, both factual and legal, leading to the FTC's action which forms the basis of the finding that Trans World became a public figure for a limited purpose are wholly dissimilar from those in *Rosenbloom,* above, in which the plaintiff, a distributor of nudist magazines, happened to have been arrested when making a delivery to a newsstand in the course of a crackdown by police on newsstands selling obscene materials. His complaint concerned subsequent newsbroadcasts describing the magazines he distributed as obscene.

**4.** The position of Trans World is also entirely different from that of plaintiffs in *Gertz* and *Time, Inc.,* above. In the former case, plaintiff

was a private lawyer who merely represented the family of a boy shot by a policeman in a civil suit for damages against the policeman. He was not involved in criminal proceedings against the policeman or in any of the public activities relating thereto which formed the background of the allegedly defamatory story in which plaintiff was charged with having been involved in a Communist plot to discredit the police. In *Firestone,* plaintiff was the complaining party in a divorce action which, because of the parties' wealth, social standing and alleged dalliances, attracted public attention. In neither of those cases had the plaintiff engaged in activities which by their nature could be said to have drawn them into legitimate public controversy.

send out a misstatement.[5] At most, the facts may support a finding of negligence, but there is no evidence to permit the conclusion that the defendant wire services employees "entertained serious doubt" as to the truth of their dispatches. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Plaintiff's third argument likewise fails because the wire services relied upon the FTC press release in good faith, and were not required to check the story further. Reliance on secondary sources is not itself evidence of bad faith. *Id.* at 733, 88 S.Ct. 1323.

■ Finally, plaintiff's vicarious liability theory is not persuasive because there is no evidence of any relationship between the wire services and Copley Press which would show that liability may be so ascribed. The relationship between AP and UPI and Copley Press was wholly contractual, and indeed the issue of possible liability for publications had been dealt with in a disclaimer of liability clause, which relieved both AP and UPI of any liability for damage arising from publication of any news story received from them.

■ The Court therefore concludes that the plaintiff has not raised any genuine issue of material fact with respect to actual malice on the part of AP or UPI. It is the plaintiff's burden to show, by evidence of "convincing clarity," that AP and UPI, at the time of the transmissions of the reports regarding Trans World, knew that they were false or were aware of their probable falsity. *St. Amant v. Thompson,* above, at 730–731, 88 S.Ct. 1323. Since it is clear that there is no possibility that plaintiff could carry this burden at trial, summary judgment should be granted in favor of the defendants AP and UPI. See, *Guam Federation of Teachers v. Ysrael,* 492 F.2d 438, 441 (9th Cir. 1974).

The claim against Copley Press rests on different grounds. The affidavit of Floyd Watkins, an officer and director of Trans World, states that after he became aware of the story published in the January 3, 1975 edition of the San Diego Union, he telephoned the Union Tribune Publishing Co., a division of Copley Press. He asked to speak to the "man in charge" and was connected with a person who he believes was Victor Krulak. Watkins asserts that he advised that person that the Union's story contained errors but that the person was rude and uncooperative. Subsequently, on January 27, plaintiff's attorneys mailed a demand for correction to the San Diego Union. (Comp. Ex. B.) Thereafter, on February 10, 1975, another story containing the same erroneous information was published by the Evening Tribune, also owned by defendant Copley Press. Copley Press responds that, because the editorial staffs of the two papers are different, the communications to the Union after its story was published did not make the Evening Tribune aware of the errors contained in the story.

■ No proof of knowledge of falsity or awareness of probably falsity has been offered with respect to the publication of the Union's story of January 3. Nor does the telephone call from Watkins and the letter from Trans World's attorneys supply the requisite proof as to the Tribune's subsequent story of February 10. The Court agrees with the view expressed in *Martin Marietta Corp. v. Evening Star Newspaper,* above, at 960, that "[i]f potential plaintiffs in libel suits could cut off a malice defense simply by calling a newspaper and giving a broad denial of an article, the first amendment policy embodied in *New York Times* would be undermined." See also, *New York Times Co. v. Sullivan,* above, 376 U.S. at 286, 84 S.Ct. 710.

■ Thus, the issue as to the February 10 story does not turn on the organizational structure of these two, commonly-owned newspapers, on the degree of their separateness, or on whether constructive knowl-

---

**5.** The reporter who prepared the AP dispatch which is the subject of Trans World's complaint based his report upon two previous AP dispatches, and did not check the press release itself. Both of the previous reports were unclear as to the charges against Trans World. The UPI dispatch was drawn directly from the press release.

edge is inferable.[6] Since each has a separate editorial staff, it would appear that the stories were prepared by different persons. The determinative question is whether the persons responsible for the publication of the Tribune story, on account of the previously published correction of the UPI story or other circumstances, had knowledge that it was false or were aware of its probable falsity.[7]

■ Inasmuch as that question cannot be resolved on the present record and plaintiff has stated that it has not yet completed discovery, the motion for summary judgment must be denied as to Copley Press without prejudice pending completion of discovery along the lines contemplated by this opinion.

Accordingly, it is hereby ordered that the motions for summary judgment of defendants Associated Press and United Press International be granted and judgment be entered in their favor.

It is further ordered that the motion for summary judgment for defendant Copley Press be denied, without prejudice to its subsequent renewal should the record warrant.

IT IS SO ORDERED.

---

6. It may not be irrelevant, however, to note in this connection that only nine days after publication of the erroneous story in the Evening Tribune, the Union, whose circulation is about forty percent larger than the Tribune, published a corrective story. To the extent, then, that these newspapers are regarded as a single organization, this action may create a large obstacle to plaintiff's efforts to prove actual malice.

7. "Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times 'knew' the advertisement was false, since the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement." New York Times Company v. Sullivan, 376 U.S. 254, 287, 84 S.Ct. 710, 730 (1964).