[Civ. No. 21857. First Dist., Div. Two. Mar. 15, 1965.]

*TRITON INSURANCE UNDERWRITERS, INC., Plaintiff and Appellant, v. NATIONAL CHIROPRACTIC INSURANCE COMPANY et al., Defendants and Respondents.

*Reporter's Note: This case was previously entitled ''Triton Insurance Underwriters, Inc. v. Committee on Chiropractic Welfare.''

Morgan, Beauzay & Holmes and Robert Morgan for Plaintiff and Appellant.

Von Herzen & Hutton, C. P. Von Herzen, Newell J. Hooey and Joseph L. Bortin for Defendants and Respondents.

AGEE, J.—This action is based upon the theory of unfair competition, accomplished by means of defamation and wrongful interference with a prospective business relationship. Plaintiff, Triton Insurance Underwriters, Inc., was awarded nominal damages of one dollar and costs of suit against defendants National Chiropractic Insurance Company and three of its officers, Schillig, Martyn and Goodfellow.

The trial court found that these defendants "prepared and circulated a letter . . . with an attached circular which contained statements[1] that were unfair, untrue and misleading concerning the plaintiff which statements were made without actual malice, and with the principal interest of protection of the business, custom and trade of the defendant, National Chiropractic Insurance Company, with its assureds in the State of California, in a competitive field."

Plaintiff appeals from that portion of the judgment which denies compensatory damages, punitive damages or injunctive relief. Respondents have abandoned their appeal, which was from that portion of the judgment holding their aforesaid conduct to be wrongful and actionable.

*Denial of punitive damages.* In addition to the above finding as to the absence of malice, are the following findings: "The Court further finds no facts warranting punitive or exemplary damages and expressly finds that the acts of the defendants were without actual malice" and "were done with the primary purpose of protecting and preserving the business of the [defendant National] . . . in a competitive field; . . ."

There is substantial evidence to support this finding. Moreover, a "plaintiff is never entitled to exemplary damages as a matter of right, their granting or withholding resting entirely in the discretion of the court or jury (8 Cal.Jur. 866)." (*Bille* v. *Manning*, 94 Cal.App.2d 142, 145 [210 P.2d 254]; *Brewer* v. *Second Baptist Church*, 32 Cal.

---

[1]There is no necessity for detailing these statements. It is sufficient to say that among them were such representations that Triton did not provide a "Bonafide Malpractice Insurance Policy" and that it issued "Only a Nebulous 'Certificate of Insurance.'"

2d 791, 800 [197 P.2d 713]; *Finney* v. *Lockhart,* 35 Cal.2d 161, 163 [217 P.2d 9].) We do not find any abuse of this discretion.

*Denial of injunction.* The letter and circular were circulated in July 1960. The trial was held in January 1963. The court found that there had been no ''continued conduct [by respondents] or evidence indicating the necessity for an injunction to prevent the occurrence of future conduct which the Court has found to contain statements that were unfair, untrue or misleading.''

Assuming without holding that the trial court could have granted the requested injunction, its refusal to do so was not an abuse of discretion. (*Kendall* v. *Foulks,* 180 Cal. 171, 174 [179 P. 886]; *Union Interchange, Inc.* v. *Savage,* 52 Cal. 2d 601, 606 [342 P.2d 249].)

*Findings.* Appellant, understandably, has no quarrel with the holding in its favor on the issue of liability. It argues, however, that the trial court approached the issue of compensatory damages as though the case were ''one only of interference with prospective contractual relationship and made *no* findings of fact or reached any conclusions of law with regard to the tort of unfair competition or defamation.'' This, appellant concludes, demonstrates that the trial court ''concerned itself *only* with the wrongful interference with prospective contractual relationship theory'' in considering the issue of compensatory damages. (Italics ours.)

The fallacy of the foregoing argument is that the trial court *did* make findings of fact on the issues of unfair competition and defamation.

Section 3369, subdivision 3, of the Civil Code includes ''unfair, untrue or misleading advertising'' as coming within the meaning of ''unfair competition.'' As noted above, the court found that the letter and attached circular ''contained statements that were unfair, untrue and misleading concerning the plaintiff . . . .''

The tort of defamation is also included in this same finding. A publication is defamatory if it is ''false and unprivileged'' and ''has a tendency to injure'' the one to whom it refers ''in his occupation.'' (Civ. Code, § 45.) ''The code draws no distinction in this respect between a natural person and a corporation, . . . and language which casts aspersions upon its business character is actionable.'' (*DiGiorgio Fruit Corp.* v. *AFL-CIO,* 215 Cal.App.2d 560, 570-571 [30 Cal.Rptr. 350].)

■ As we have stated, the court expressly found that the letter and attached circular contained statements that were untrue and, by its award of nominal damages, recognized that these statements constituted actionable libel.

Such an award is not inconsistent with the finding that appellant "suffered no actual damage," since it follows by necessary implication that the trial court based its judgment in favor of appellant upon the premise that said untrue statements are libelous per se and are therefore *actionable without proof of special damage.* (2 Witkin, Summary of Cal. Law, Torts, § 108, "Doctrine of Libel Per Se," p. 1279.)

■ During the trial, an issue arose as to whether respondents were seeking to establish a monopoly in the sale of malpractice insurance to California chiropractors. Appellant contends that an adequate finding was not made on this issue.

The finding made was that the writing of such malpractice insurance was "in a competitive field." This finding necessarily negatives the existence of a monopoly. The evidence is undisputed that Lloyd's of London wrote this type of insurance and, as of October 17, 1958, had 293 policyholders among the members of California Chiropractic Association. The number of such policyholders rose to 364 by January 13, 1960.

In conclusion on the subject of the adequacy of the findings of fact, there is nothing in the record to indicate that appellant made any written request for more specific findings on any of the issues. (Code Civ. Proc., § 634.)

*Denial of general damages.* This is the major issue. There were no special damages pleaded or proved. The facts are stated in the light most favorable to the judgment.

Respondent National is an Iowa insurance company specializing in malpractice insurance for chiropractors. It sold such insurance only to chiropractors who were members of the National Chiropractic Association (NCA).

In July, 1958, the California Chiropractic Association (CCA), a professional society whose members constituted approximately one-fifth of the licensed chiropractors in the State of California, authorized the setting up of an "insurance exchange" to handle the malpractice insurance needs of its members.

On January 21, 1959 appellant Triton was incorporated for the purpose of acting as the attorney in fact and manager

for the contemplated exchange. On January 13, 1960 the California Commissioner of Corporations issued to Triton a one-year permit to sell 58,200 shares of its stock at $5 per share.

The permit required that a *minimum* of $240,000 be raised and impounded before appellant could commence business. In June, 1960, appellant circulated its prospectus to the members of CCA. The total amount of stock sold was $3,850 and the last sale was made on December 5, 1960. The permit expired on January 11, 1961, and on April 24, 1961, the Corporations Commissioner ordered that all moneys deposited by the subscribers be returned to them.

In July, 1960, respondents caused the letter and attached circular which they had prepared to be mailed to the members of CCA and to the California members of NCA. This is the printed matter which the trial court found to contain "statements that were unfair, untrue and misleading concerning the plaintiff [Triton]." The purpose of the letter was to discourage the purchase of stock in Triton and to extoll the merits of the insurance issued by National.

The heart of appellant's theory as to damages is that, as the proximate and direct result of these statements made by respondents, it was unable to sell the required amount of stock and was thus prevented from engaging in the business of acting as attorney in fact and managing agent for the contemplated exchange.

The record shows that the subject of having its own insurance exchange and an attorney in fact to manage it had been the source of general discussion among the chiropractors practicing in California for at least two years before Triton circulated its brochures and subscription agreement blanks. Those receiving this literature were generally familiar with the subject matter contained in the brochure before they received it. Consequently, it would be expected that any who desired to buy any of the stock would reply with reasonable promptness.

Although Triton's permit to sell stock was issued on January 13, 1960 and its form of subscription agreement was approved by the Corporations Commissioner on March 16, 1960, it had succeeded in raising only $2,100 through the sale of its stock up to July 30, 1960, and only $1,750 thereafter. Thus, only 1.6 per cent of the required amount of $240,000 was raised during the one year period of the permit.

Appellant made no claim for special damages. The at-

torneys for appellant had rendered their legal services and had advanced the costs of organizing the corporation and obtaining the permit to sell stock under a contingent agreement calling for payment in stock when, as and if the issuance of such stock was authorized by the Corporations Commissioner. The costs of preparing and printing the brochure and promoting the sale of stock were expended by CCA.

No stock was ever issued under the original permit and appellant abandoned all plans for any future offering of its stock. On May 1, 1961, appellant applied to the Corporations Commissioner for a supplemental permit authorizing it to sell 600 shares for cash to six named individuals, stating that it was ''currently the plaintiff in a lawsuit which requires its continued existence'' and that it ''proposes to utilize the receipts for its said stock issue in furtherance of said lawsuit . . . .''

The application further stated that ''Applicant [appellant] has neither assets nor liabilities, having remained inactive since incorporation.''

The trial court found that appellant ''had no goodwill at the time of the events complained of, and that any future goodwill is speculative and uncertain and had no monetary value at said time.'' This finding is supported by substantial evidence, appellant's insistence to the contrary notwithstanding.

Whether the actionable wrong committed by respondents is labeled defamation,[2] unfair competition, trade libel, or wrongful interference with a prospective business relationship, any award of general damages must be based upon some reasonable ground.

In its Memorandum of Decision, filed three months before the findings were signed, the trial court said: ''Conceding that an actionable wrong has been established in this case, we are nevertheless confronted with the question as to whether or not the fact of damages has been proven by the plaintiff. The Court is not unmindful of the fact that difficulty of proof insofar as the *amount* of damages is concerned should not be a bar to their allowance, provided there is some reasonable basis upon which they can be computed.''

---

[2]As stated in *DiGiorgio Fruit Corp.* v. *AFL-CIO, supra,* 215 Cal. App.2d, at p. 571, ''[W]hile a corporation has no reputation in the personal sense to be defamed by words, such as those imputing unchastity, which would affect the purely personal reputation of an individual, it has a business reputation, and language which casts aspersions upon its business character is actionable.''

■ In order for appellant to recover general damages herein it is necessary that the evidence support a finding that there was a reasonable probability that, had it not been for respondents' "actionable wrong," it would have been able to sell stock in the aggregate amount of $240,000, and would thus have become eligible to qualify as the attorney in fact for the contemplated insurance exchange.

The crucial question before us is whether the following findings of the trial court are supported by substantial evidence: "that the permit issued by the Corporation Division of the Department of Investment of the State of California required the plaintiff to sell at least $240,000.00 of its stock . . ."; that "it does not appear from the evidence that, except for the wrongful acts of the defendants, there was a reasonable probability that the plaintiff would have qualified to engage in the insurance business as attorney in fact . . ."; that "it is not true that as a direct or proximate result of the acts of the defendants plaintiff has been unable to sell its stock or has been damaged in the sum of $240,000.00."

The evidence which appellant mainly relies upon to show the effect of respondents' letter is based upon a questionnaire prepared by appellant and mailed by CCA to its 1,003 members on August 16, 1960. There were 569 who replied.

The poll was suggested by appellant's attorney. Its purpose was to obtain evidence to support this action, which was commenced on August 5, 1960.

There were 71 "yes" answers to the question: "Did this letter [respondents'] influence you in your decision not to subscribe to stock of Triton Insurance Underwriters Co.?" The extent of this influence was not asked for or stated.

Out of this group of 71, there were 48 who also answered "yes" to the following question: "Did this letter [of "The San Fernando Valley CCA-NCA Constitutional Rights Committee"] influence you in your decision not to subscribe to stock of Triton Insurance Underwriters Co.?"

Respondents did not send out the San Fernando letter and were not held responsible for it. Judgment was rendered in favor of those defendants (Sibson, Leventhal, Klasson and Meske) who were charged with its circulation[3] and appellant has not appealed from that portion of the judgment.

An expert on marketing research and analysis was called

[3]Appellant's counsel offered this letter in evidence only as against these four chiropractors.

as a witness by appellant and he concluded from his analysis of the poll that "It is reasonable to believe that these two letters constituted a major deterrent in the minds of over an eighth of the membership of the California Chiropractic Association."

Both letters vigorously attack appellant's stock-selling proposal and the expert did not give an opinion as to which was the more effective. A more illuminating question would have been: "If you had not received the letter circulated by respondents, would you have subscribed to the purchase of Triton stock and, if so, how much?"

■ The weight to be given the expert's opinion was for the trial court. It was not bound to follow it. (*People* ex rel. *Department of Public Works* v. *Rice,* 185 Cal.App.2d 207, 213 [8 Cal.Rptr. 76] ; *Ortzman* v. *Van Der Waal,* 114 Cal.App.2d 167, 170 [249 P.2d 846, 252 P.2d 7].)

■ If we accept appellant's argument that one-eighth of the membership of CCA, or approximately 125 members, probably would have subscribed for Triton stock if not deterred by respondents' letter and the San Fernando letter, then the next question is, what would be the average amount of stock each could reasonably be expected to buy?

The average amount subscribed for by the 15 members who did subscribe is 51⅓ shares or approximately $257. If this average amount is multiplied by 125, the total would be $32,125. This falls far short of the required goal of $240,000.

We think that the record in this case is more than sufficient to support the trial court's finding that "it does not appear from the evidence that, except for the wrongful acts of the defendants [respondents], there was a reasonable probability that the plaintiff would have qualified to engage in the insurance business as attorney in fact. . . ."

Appellant cites *Zimmerman* v. *Bank of America,* 191 Cal. App.2d 55 [12 Cal.Rptr. 319], which recognizes that wrongful interference with a prospective contractual relationship is a tort. The trial court stated in its Memorandum of Decision that this decision "contains an excellent discussion of the nature of this tort and sets at rest any doubts as to its recognition in California," adding, however, that "we are nevertheless confronted with the question as to whether or not the fact of damages has been proven. . . ." The *amount* of damages was not involved in *Zimmerman.* It was an appeal from a judgment entered upon the sustaining of a demurrer to the

complaint without leave to amend, the lower court holding that a cause of action had not been stated.

*DiGiorgio Fruit Corp.* v. *AFL-CIO, supra,* 215 Cal.App.2d 560, demonstrates that mere difficulty in determining the amount of general damages sustained by the wronged party will not prevent a recovery therefor.

This was an action for damages for publication by defendants of a libelous motion picture film, entitled "Poverty in the Valley of Plenty" which allegedly depicted the deplorable living conditions of the employees on the farms operated by plaintiff corporation. The trial court found in substance that "the publication tended to injure, and in fact did injure, respondent [plaintiff] in its business and occupation." (P. 568.)

The appellate court called attention to the huge operations of plaintiff and the fact that the film was shown primarily to agricultural workers who might accept employment by plaintiff. It concluded that, "in the absence of any proof of special damages, we believe the principal damage that could reasonably accrue to respondent [plaintiff] from the showing of the film would be damage to its reputation as an employer which would make it more difficult to secure farm laborers." (Pp. 578-579.)

In the instant case, the record is lengthy and the exhibits are many. The trial court concluded that, even without the respondents' letter and circular, there was no reasonable probability that appellant would have been able to sell enough stock ($240,000) to become eligible to qualify as attorney in fact for the proposed insurance exchange.

In *DiGiorgio,* on the contrary, the trial court found a sufficient basis upon which general damages could reasonably be awarded, and, to the extent of $10,000, the appellate court affirmed this finding of the trial court.

In the instant action, the trial court found that there was no reasonable basis upon which general damages could be awarded. We agree.

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied April 9, 1965, and appellant's petition for a hearing by the Supreme Court was denied May 12, 1965.