[Civ. No. 23864. First Dist., Div. Two. Sept. 21, 1967.]

FLOYD STONEKING, Plaintiff and Respondent, v. CLARENCE E. BRIGGS et al., Defendants and Appellants.

Gordon & Welch, George R. Gordon, Levy, DeRoy, Geffner & Van Bourg and Victor J. Van Bourg for Defendants and Appellants.

Douglas R. Page for Plaintiff and Respondent.

AGEE, J.—This is an action for slander brought by Floyd Stoneking against Clarence Briggs, who made the statements complained of, and his employer, the United Brotherhood of Carpenters and Joiners of America (hereafter "international"). A jury returned a verdict in favor of Stoneking in the sum of $22,000 compensatory damages. A motion for a new trial was denied and this appeal follows.

## EVENTS PRECEDING STATEMENTS

Local 2046 (hereafter "local") is a 2,300-member organization headquartered in Martinez and affiliated with the international. For some 10 years prior to 1964, the local had experienced unrest caused by the bitter rivalry of various factions within it.

In 1963, Stoneking became a candidate for the office of president of the local. He was not a member of any particular faction and was somewhat surprised when he was elected president.

During his term of office, Stoneking tried as best he could to execute his duty as president to conduct membership meetings in an orderly and democratic manner. However, by use of "the old diamond system,"[1] competing factions rendered it difficult to conduct meetings properly.

By May 25, 1964 it became apparent to Stoneking that the meetings were beyond his power to control and that many members could not exercise their right to be heard. On said date, the local executive board, led by Stoneking, decided to

---

[1] "The old diamond system" is the spotting of the members of a particular faction all around the room such that that faction could "get the floor." Under such circumstances, order is difficult to maintain.

petition the international to come to its assistance. A report to this effect was received by the international on June 1, 1964.

On June 4, the international informed the local by letter that it had decided to appoint a committee to conduct a hearing concerning the local's problems. All members of the local were invited to attend and testify.

The hearing was held in Concord from June 17 to June 20, 1964, during which time more than 70 witnesses testified. The committee prepared written findings and recommended that the local be placed under the *trusteeship* of the international.[2]

On August 24, 1964 the international informed the local by letter that the committee recommendation had been unanimously accepted by the General Executive Board, and that Briggs had been appointed "to supervise the affairs of Local Union 2046 under the direction of Board Member Sidell."

On September 11, 1964, at a general membership meeting, Sidell and Briggs announced the trusteeship to the members and formally undertook management of the local. Thereafter, Briggs presided at membership meetings.

On October 7, 1964 Briggs was at international headquarters in Washington, D.C., discussing the affairs of the local with Sidell. It was decided that two of the local's officers would be removed: president Stoneking and financial secretary Thomas Baum.

On October 16, Briggs called a special executive meeting at the local. Just before the meeting was to open, Briggs informed Stoneking of the decision to remove him from office. At Briggs' request, Stoneking opened the meeting and then relinquished control to Briggs.

### STATEMENTS MADE BY BRIGGS

Following the removal of Stoneking and Baum, five articles appeared in Bay Area newspapers concerning the trusteeship and the removal of Stoneking and Baum. These articles contained numerous statements (some direct quotations) attributed to Briggs. This action for slander is based upon the statements *as they were made to the reporters who wrote these*

---

[2]Section 302 of the Labor-Management Reporting and Disclosure [Landrum-Griffin] Act of 1959 provides: "Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."

568

*articles.* Damage is based upon the newspaper articles *to the extent they foreseeably republished and circulated the slander.*

On October 19, 1964 James Johnson, a reporter for the Oakland Tribune, had a telephone conversation with Briggs. In substance Briggs told him the following: that the president and financial secretary had been removed from office for internal reasons, a procedure to put the local back in the hands of the membership where it belonged; that the two vacated offices had been placed in trusteeship, which meant that union and federal laws had not been complied with; that he could not elaborate because a detailed report was going to be presented to the membership that evening; that the removal was designed to bring order out of chaos; and that the two men had been under investigation for some time and extensive hearings had been held.

On that same day, an article based upon the foregoing information appeared in the Tribune. At that time the newspaper had a circulation of approximately 200,000.

On October 20, 1964 Charles Chapman, a reporter for the Pittsburg Post Dispatch and the Concord Daily Transcript, had a telephone conversation with Briggs. In substance Briggs told him the following: that the two officers had been removed for internal reasons, a matter of bringing order out of chaos; that he would not elaborate further, except to say that no shortage of union funds was involved; that both men had been under investigation for some time and the removal followed extensive hearings; that along with the removal, the local had been placed under trusteeship in accordance with union and federal laws; that the international would report periodically to the Bureau of Labor Management of the U.S. Department of Labor and that he would keep the international informed of the status of the local's problems; that at the proper time the trusteeship would be lifted and the local put back in the hands of its members; that the trusteeship would continue until such time as an election could be held to select a new president and a new financial secretary and that his duty was to insure that it was a fair and honest election; and that a detailed report on the foregoing had been given to the membership of the local.

On October 20 and 21, articles based upon the foregoing information appeared in the Daily Transcript and the Post Dispatch, respectively. The former had a circulation of 10,000 to 12,000; the latter, 5,000 to 7,000.

Johnson and Chapman testified directly to what they could recall Briggs had said at the time of trial. In addition, both reporters testified that the portions of their newspaper articles which purported to be direct quotations of Briggs' statements constituted a substantially accurate recordation of what was said during the two telephone interviews.

At trial, counsel for defendants stated that he had no objection to the admission in evidence of such direct quatations. (On the admissibility of past recollection recorded, see Code Civ. Proc., § 2047, replaced by Evid. Code, § 1237 on January 1, 1967.) On appeal, defendants note that according to the reporters' testimony "the articles substantially reflected the conversation as it occurred."

On October 20, 1964 the Oakland Tribune published a second article concerning the affairs of the local. The author of the article, Bob Carr, did not testify. However, Briggs admitted that he had a telephone conversation with Carr and that the statements attributed to him in the article were in fact made.

On October 21, or 22, 1964 Margaret Miller, a reporter for the Contra Costa County Labor Journal, interviewed Briggs at the local's headquarters in Martinez. She asked Briggs "if the Tribune story [by Bob Carr] was true, if there were any inaccuracies in it." Briggs replied that the article was substantially true. (See *Hellar* v. *Bianco* (1952) 111 Cal.App.2d 424 [244 P.2d 757, 28 A.L.R.2d 1451].)

In addition to Briggs' statements, the Tribune story contained several statements made by Robert Holland of the San Francisco office of the U.S. Department of Labor.

Briggs told Mrs. Miller that if she decided to print the Tribune story he had only one thing to add, to wit: that the international was taking steps to return the local to its membership and that this was the reason he was there.

On October 23, 1964 an article written by Mrs. Miller appeared in the Labor Journal. She commenced the article with the statement Briggs said he would like to add and then reproduced in full the Tribune story for which Briggs had vouched.[3] (On adoptive admissions, see Code Civ. Proc,

---

[3]The Tribune article written by Bob Carr was as follows:

"U.S. Labor Official Bares Key to Carpenter Union Ousters

"MARTINEZ—Two officers of the 2,350-member Carpenters Union Local 2046 were relieved of duties under provisions of the Landrum-Griffin Act, it was revealed today.

"Union Local President Floyd Stoneking and financial secretary Thomas D. Baum were relieved of duties Friday, and the local placed under trusteeship of the international headquarters.

§ 1870, subd. 3, replaced by Evid. Code, § 1221 on January 1, 1967.) The Labor Journal had a circulation of 8,000, and the local subscribed for all of its members.

The trial court instructed the jury that the statements made to Mrs. Miller were conditionally privileged as a matter of law since the local's difficulties was a topic of common interest between Briggs and Mrs. Miller. (See Civ. Code, § 47, subd. 3.)

The court further instructed that the privilege would be lost if Briggs did not in good faith believe the truth of the statements, if he had no reasonable grounds to entertain such belief, if the statements were unfair, if the publication was motivated by hatred or ill will towards Stoneking or by any reason other than protecting the common interest for which the privilege is given, or if Briggs made the statements maliciously and in bad faith. (See *MacLeod* v. *Tribune Publishing*

"All that International Representative Clarence Briggs would say yesterday was that the two men had been relieved for 'internal reasons' and that union and federal laws have not been complied with.

"CITES REASONS

"But Robert Holland of the San Francisco office of the U.S. Department of Labor was more specific.

" 'The Brotherhood of Carpenters is very loath to impose trusteeship,' Holland said. 'It is very rare, and with the carpenters, particularly.'

" 'We have been interested, and have done some investigating,' he continued.

" 'The Landrum-Griffin Act specifies that a local can be put in trusteeship for certain specific reasons, but these are quite broad,' Holland said.

"Holland stressed that the two former officers have not been ousted from the union, but only relieved of officer duties.

"REPORT FILED

"Holland explained that the Carpenters International, as required by law, filed a trusteeship report with the Labor Department, after a series of hearings conducted at local union headquarters here.

"The report, according to Holland, says in part, 'trusteeship was assumed Sept. 11 to assure performance of collective bargaining agreements, to restore procedures, and other reasons, including the findings of a committee.'

"Holland said that 70 witnesses testified at the local's hearings here, and under oath told of dissension in local union meetings, organized groups acting in opposition to the best interests of the union, hiring hall abuses, lack of membership morale, charges and countercharges among officers, discord, personal disagreements, and harassment of certain officers.

"Holland, pointing out the trusteeship report is a matter of public record, said that William Sidell of Los Angeles, a vice-president of the Carpenters International, is actual trustee, while Briggs is administering the union local under him.

"Sidell, Holland said, was a member of the original committee which began hearings and investigations months ago.

"Briggs said today a report of the trusteeship procedure was presented the membership last night in its regular meeting."

*Co.* (1959) 52 Cal.2d 536, 552 [343 P.2d 36] ; *Krause* v. *Bertrand* (1958) 159 Cal.App.2d 318 [323 P.2d 784].)

Defendants argue that since the jury did not award punitive damages, it impliedly found an absence of malice; and therefore the conditional privilege was not lost. This argument must fall for two reasons. First, the mere failure to award punitive damages does not necessarily negate the existence of malice. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 800-801 [197 P.2d 713] ; *Davis* v. *Hearst* (1911) 160 Cal. 143, 173 [116 P. 530] ; *Triton Ins. Underwriters, Inc.* v. *National Chiropractic Ins. Co.* (1965) 232 Cal.App.2d 829, 831 [431 Cal.Rptr. 504].) Second, even if there were no malice, under other portions of the court's instructions the jury could have found that the privilege had been lost.

## DEFAMATION

The trial court instructed the jury that it had "determined, as a matter of law, that the alleged statements made by the defendant Briggs could have two meanings, one of which is harmless and the other defamatory. . . ." It left for the jury the question of whether or not the statements "were in fact made and used in that defamatory sense." (See *MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d at 548-549; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 413-415 [46 Cal.Rptr. 135] ; *White* v. *Valenta* (1965) 234 Cal.App.2d 243, 257-258 [44 Cal.Rptr. 241, 13 A.L.R.3d 1271].)

The court further instructed that a "defendant may be liable for defamatory statements that are insinuated as well as for those that are stated explicitly." Defendants do not question this rule of law. They strenuously argue, however, that whatever *was* insinuated by Briggs' remarks was either not defamatory or, if defamatory, true. In essence, then, defendants challenge the sufficiency of the evidence to support the implied findings of the jury against them on these two points.

The issue is one of fact, whether, when the statements are given a fair. natural and reasonable construction, average persons of ordinary intelligence would attribute to the statements a defamatory import. present either explicitly or implicitly. As the jury was instructed, the words and insinuations involved herein must be judged "by the natural and probable effect upon the mind of the average reader."

In each interview between Briggs and a reporter, Briggs clearly indicated that the local was fraught with serious diffi-

culties. This was undoubtedly true. It is evident, however that the way in which Briggs *commented upon* these difficulties he insinuated that the two officers removed, Stoneking and Baum, were in fact the central cause of the problems, the focal point, so to speak, of the turmoil within the union. The apparent purpose of his statements was to provide information concerning the two officers.

The statements made to Johnson provide the clearest illustration of such insinuation. Briggs' remarks dealt exclusively with the removal of the two officers.

Although the reference to "internal reasons" is vague, Briggs specified that the removal was necessitated by his desire to put the local back in the hands of the membership where it belonged and to bring order out of chaos. Briggs insinuated that the two officers were the cause of the abuses sought to be eliminated.

This was fortified by Briggs' relating the trusteeship, the failure to comply with union and federal laws, and the investigation directly to the removal.

The statements made to Chapman are in large measure similar to those made to Johnson, except that Briggs provided Chapman with somewhat more detail. Again, the local's problems, the trusteeship, and the investigation and hearings are directly connected to the two officers and their removal.

The termination of the trusteeship is related to the holding of an election of a new president and a new financial secretary and the return of the local to the membership. The elimination of the possibility of reinstating Stoneking and Baum underscored the insinuation that their removal had been crucial to the solution of the local's problems.

The statements made to Mrs. Miller, together with Briggs' vouching for the second Tribune article, are perhaps the least pregnant with insinuation. Suffice it to say that the Tribune story emphasized the removal of the two officers in relation to the trusteeship and that Briggs' additional remark to Mrs. Miller insinuated that the two officers had not executed their duties for the benefit of the membership.

To summarize collectively the insinuations which the jury was entitled to find in the statements made to the various reporters, Briggs charged that the trusteeship was necessary to return the local to the hands of the membership where it belonged and that the pivotal factor in the imposition of trusteeship was the conduct of the two officers removed, which

conduct had been the subject of long investigation and extensive hearings.

As to Stoneking, then, the sting of the accusation is that he had failed to act for the best interest of the membership and was grossly incompetent to occupy the office of president. There can be no question that this "[t]ends directly to injure him in respect to his office, profession, trade or business, . . . by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires. . . ." (Civ. Code, § 46, subd. 3.)

Defendants admit, as they must, that although Stoneking's primary occupation is that of carpenter, his capabilities as a union officer are also afforded protection from defamatory and untrue statements. (See *Correia* v. *Santos* (1961) 191 Cal. App.2d 844, 853-855 [13 Cal.Rptr. 132].)

The issue remaining, therefore, is whether or not the defamatory accusation is true. In this regard, defendants hasten to point out that "substantial truth is all [that they] . . . are required to show by way of defense. Strict and technical accuracy is not required."

It is well settled that "defendants were not required to justify every word of the defamatory matter. It was sufficient if the *gist* or *sting* of the libelous charge was justified, and immaterial variances and defects of proof upon minor matters are to be disregarded if the substance of the charge be justified." (Italics added; *Skrocki* v. *Stahl* (1910) 14 Cal.App. 1, 5-6 [110 P. 957]; see also *Emde* v. *San Joaquin County etc. Council* (1943) 23 Cal.2d 146, 160-161 [143 P.2d 20, 150 A.L.R. 916]; *Hearne* v. *De Young* (1898) 119 Cal. 670, 674 [52 P. 150, 499]; *Kurata* v. *Los Angeles News Publishing Co.* (1935) 4 Cal.App. 2d 224, 227-228 [40 P.2d 520].)

Defendants attempt to rely on this principle in order to avoid the effect of certain explicitly inaccurate statements. These are: that the two vacated offices had been placed in trusteeship for violation of union and federal laws (*fact*: that the local as an entity had been placed in trusteeship in accordance with union and federal laws); that Stoneking and Baum had been under investigation for some time (*fact*: that the local as an entity had been under investigation for some time); that the removal followed extensive hearings (*fact*: that extensive hearings had been held four months prior to the removal, but bore no causal relationship to the removal); that the local had been placed in trusteeship along with the

removal (*fact*: that the local had been placed in trusteeship independently of and two months prior to the removal).

It is evident from previous discussion of Briggs' statements that these inaccuracies were to a great extent the cause of the defamatory insinuations contained therein. Thus, such inaccuracies cannot be termed "minor matters."

Defendants contend that in any event these inaccuracies were substantially true. The point need not be pursued further since the specific question is whether the sting of the accusation made by insinuation was substantially true, not whether each statement taken separately was.

The record in the instant case shows that Stoneking was unable to maintain proper order at membership meetings. He admitted this, as he likewise admitted that he approved of the recommendation of trusteeship which followed the hearing he requested, and approved of his own removal in an effort to solve the local's problems.

The record fails to show, however, that Stoneking was either morally or legally responsible for the local's difficulties or that he had acted adversely to the local's interest or that he was unfit to be president. The jury well could have concluded that factionalism within the local had reached such proportions that it was beyond intra-local control.

This does not prove the substantial truth of the implicit accusations made by Briggs. Consequently, the implied finding of the jury that average persons of ordinary intelligence would attribute defamatory insinuations to Briggs' statements and that such insinuations were not true is supported by the record; and the verdict in favor of Stoneking must be affirmed.

### INSTRUCTIONS DEFINING SLANDER

Defendants offered the following instruction: "You are instructed that the law defines 'slander' as a false and unprivileged publication orally uttered [or by mechanical means], which charges any person with crime or with having been indicted, convicted or punished for crime; tends directly to injure him in respect to his office, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation presumably requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen his profits; *or which, by natural consequence causes actual damage.* Only language coming within this definition of slander is

actionable, and the mere fact that a publication is unpleasant or hostile does not make it slander.'' (Italics added.)

The trial court gave the requested instruction with two modifications: (1) the portion thereof which is enclosed in brackets was added by the court; (2) the portion italicized was deleted.

The proposed instruction is obviously based upon Civil Code, section 46[4] which contains five subdivisions stated in a disjunctive series. Defendants included only subdivisions 1, 3, and 5. They make no objection to the deletion of that portion of the instruction based upon subdivision 5.

Defendants do contend, however, that after such deletion, it was error for the court not to insert the words ''or which'' between the two remaining clauses and thus preserve the disjunctive series as defendants had done.

Specifically, defendants argue that '' [a]s the instruction was given by the Court, the use of the semicolon after the word 'crime' must act either conjunctively so that the sentence reads '. . . punished for crime and tends directly . . . ,' or, it acts appositionally so that the second clause, 'tends directly to injure . . . ,' is to be taken synonymously with the previous clause regarding conviction or punishment for crime. In either case, the meaning thereby established is improper.''

From the cold written record it is impossible to discover the manner in which the trial court may have paused when reading to the jury the two clauses, the two alternative bases on which they could find slander. The semicolon which appears between the two in the modified instruction is, after all, only a written signal to pause.

Since the jury could not *see* the semicolon, no argument can be predicated merely upon its presence at a particular place

---

[4]Section 46 provides: ''Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:

''1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;

''2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;

''3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits;

''4. Imputes to him impotence or a want of chastity; or

''5. Which, by natural consequence, causes actual damage.''

in the instruction given. Even if the jury were confused as defendants suggest, such could not possibly work to the prejudice of defendants.

If the jury understood the two clauses *conjunctively*, then it would have had to find more than Stoneking was required to prove. If the jury understood them *appositionally*, then it would have had to find exactly what it was required to find under defendants' proposed instruction, i.e., either one of the two alternatives, even though it might erroneously believe that finding one was the same as finding the other.

### ADMISSIBILITY OF NEWSPAPER CLIPPINGS

■ Defendants "contend that the Trial Court erred as a matter of law in admitting newspaper clippings purportedly repeating what Mr. Briggs had said to reporters."

There is no dispute that such clippings are hearsay when offered to prove the truth of matters stated therein. (*Carpenter* v. *Ashley* (1906) 148 Cal. 422 [83 P. 444, 7 Am.Cas. 601] ;[5] *People* v. *Gibson* (1958) 160 Cal.App.2d 535, 537 [325 P.2d 500] ; *Shumate* v. *Johnson Publishing Co.* (1956) 139 Cal.App.2d 121, 133 [293 P.2d 531].)

Those portions of the clippings which were admissible under exceptions to the hearsay rule have been discussed above. The question here presented is whether the trial court should have admitted the clippings in their entirety.

In *Mercado* v. *Hoefler* (1961) 190 Cal.App.2d 12, 19 [11 Cal.Rptr. 787], this court held that newspaper clippings can be admissible on the issue of damages in a slander action. "The original utterer of slanderous remarks can be liable for the consequences of republications to third persons. [Citation.] The background of notoriety and publicity preceding the slanderous remarks certainly is indicative of the possibility of aggravated harm caused when such comments were made to a newspaper reporter; thus the clippings were material to the issue of damages. The relevancy of evidence is tested by whether it tends logically, naturally, and by reasonable inference to prove or disprove a material issue. [Citation.] A wide discretion is left to the trial judge in determining the relevancy and admissibility of evidence. [Citation.]"

In the instant case, *Mercado* was brought to the attention of the trial court. Thus, when the first newspaper clipping was admitted, the court commented to the jury: "I am going to

---

[5]Questioned on another point in *Lewis* v. *Linn* (1962) 209 Cal.App.2d 394, 398 [26 Cal.Rptr. 6].

permit the receipt in evidence of Plaintiff's Number 1. . . . [I]t would appear [admissible] to the Court at least for the limited purpose, if for no other purpose, of showing the notoriety to which the statements were received, that the newspaper clipping would at least be corroborative of the testimony of the witness insofar as the circulation of the newspaper is concerned.''

This limiting instruction was not repeated when the other four clippings were later admitted in evidence or when the jury was formally instructed at the completion of the trial. Since defendants ''made no request for such a limiting instruction, they cannot now complain that none was given. [Citation.]'' (*Mercado* v. *Hoefler, supra,* 190 Cal.App.2d at p. 20; see Evid. Code, § 355.)

Defendants argue that, despite the materiality of the clippings on the issue of damages, the trial court should have exercised its discretion to exclude the evidence because relevancy was sufficiently outweighed by the risk of undue prejudice to defendants. (See Evid. Code, § 352.) In this regard, defendants contend that Stoneking had ample opportunity to prove the fact of repetition and the extent of newspaper circulation *by other evidence,* i.e., the testimony of the reporters.

The risk of prejudice of which defendants complain is the possibility that the jury would be more impressed with the written word of the clippings than with the oral testimony of the reporters. Thus, it is argued, the jury may well have considered the clippings for the truth of the matters stated therein. Of course, this risk could have been largely eliminated if defendants had offered appropriate instructions showing the jury the extent to which it could use the various clippings.

In the instant case, the greatest source of damage to Stoneking resulted from the repetition of the slander. There could be no question that Briggs ought to have anticipated republication of statements made to inquiring reporters. This was clearly the purpose for which the reporters sought information.

Thus, if the jury found any or all of the statements to reporters slanderous, the clippings were necessary in order to measure the extent to which the slander was repeated and to properly assess damages. The size of the newspaper article, the page on which it appeared, and the nature of the headline

(if it resulted proximately from the statements) — all were highly relevant to the issue of damages.

Indeed, the five clippings herein were more relevant than the four involved in *Mercado*. Here, all five related to the direct republication of the alleged slanderous statements. In *Mercado,* only one so related. The other three could not be attributed to the defendant and were evidently true, but they were admitted to show the background against which the slander was uttered and republished in the *later* fourth article.

## ISSUE OF MALICE

The pretrial order in the instant case specified "exemplary damages" as one of the issues to be tried. Of necessity, this made malice an issue, and Stoneking presented evidence thereon.

Defendants contend that the trial court erred in submitting the issue of malice to the jury. No punitive damages were awarded; however, if the court had found no malice as a matter of law, then the international's financial statement showing substantial assets would not have been placed before the jury.[6] (See Witkin, Cal. Evidence (2d ed. 1966) § 377, pp. 335-336.)

The trial court gave three instructions on the issue of malice: two on what was necessary to have malice, and one on what was necessary to impute malice to an employer. One of the instructions on the definition of malice was given at the request of defendants. The other two instructions were proposed by Stoneking.

At no time did defendants withdraw their requested instruction or indicate in any manner that they wished to remove the issue of malice from the case.[7]

Defendants cannot urge that it was error to give the instruction they proposed or the instructions offered by Stoneking concerning the same matter. (4 Cal.Jr.2d, Appeal and Error § 557, p. 423.)

[6]Defendants also argue that if the trial court found no malice as a matter of law, then the testimony of Mrs. Miller and the second Tribune article, which is dependent upon such testimony, would have been stricken. As already noted, this is based upon the erroneous assumption that under the instructions given only a finding of malice could have removed the conditional privilege asserted.

[7]Since malice was specified as an issue by the pretrial order, defendants would have to obtain, in effect, either a nonsuit or a directed verdict as to that issue in order to remove it from the deliberation of the jury. It is fundamental that both a nonsuit and a directed verdict demand a motion requesting such relief and stating with particularity the basis

## EXCESSIVE DAMAGES

Defendants' final contention is that the $22,000 awarded by the jury as compensatory damages[8] was excessive as a matter of law. The same contention was strongly urged in defendants' motion for a new trial. In its minute order denying the motion, the court commented that it had given the matter "most thoughtful attention" and had concluded that the jury properly exercised its judgment and discretion in assessing damages.

In defamation cases "there is no accurate standard by which to compute the injury, and the jury must, necessarily, be left to the exercise of a wide discretion . . . ." (*Wilson* v. *Fitch* (1871) 41 Cal. 363, 385-386.)

"The law presumes that the award is the result of full and careful deliberation, and prompted by fair and just motives. And this presumption acquires added strength when the trial judge, who has heard all the evidence, reviews the verdict on motion for a new trial under the same objections urged against it here and declines to disturb it." (*Dunn* v. *Hearst* (1903) 139 Cal. 239, 240-241 [73 P. 138].)

Consequently, the determination of the jury on the issue of damages is conclusive on appeal unless the amount thereof is so grossly excessive that it can be reasonably imputed solely to passion or prejudice in the jury. (*Dunn* v. *Hearst, supra;* *Earl* v. *Times-Mirror Co.* (1921) 185 Cal. 165, 186-190 [196 P. 57]; *Hanley* v. *Lund* (1963) 218 Cal.App.2d 633, 644-645 [32 Cal.Rptr. 733]; *Bell* v. *Kelly* (1925) 73 Cal.App. 189, 191 [238 P. 719]; on excessive or inadequate damages in defamation cases, see 35 A.L.R. 2d 218.)

At the time of the slander in the instant case, Stoneking had been a member of Local 2046 for 21 years. He had served a term as president of the local prior to the term from which he was removed, had served six years on the local exam-

---

upon which it is sought. (2 Witkin, Cal. Procedure (1954) Trial, §§ 128-130, 133, Supp. § 133.) This is to afford the party against whom the relief is sought an opportunity to cure whatever defect appears in the proof. In the instant case, defendants did not request either a nonsuit or a directed verdict as to the issue of malice.

[8]The verdict rendered by the jury stated that the $22,000 was the measure of general and special damages. Although Stoneking testified that after the alleged slander he lost a month's work and could no longer obtain carpenter-foreman employment there is no evidence showing the specific dollar-value for such damages. The award, therefore, represents only general damages, and the parties have argued the question of damages on appeal with this limitation in mind.

ining board, and had served four years as delegate to the Contra Costa County Central Labor Council.

In addition to these union positions, Stoneking had held various public elective offices, to wit: a trustee of Ambrose Park and Recreation District for 10 years, a member of the Contra Costa County Democratic Central Committee for two terms, a director of the Shore Acres West Pittsburg Youth Council.

The newspaper articles which directly resulted from Briggs' statements and substantially repeated those statements received wide circulation. The Contra Costa County Labor Journal was distributed among the local's 2,300 members.

Stoneking and his family resided in the immediate vicinity of the newspaper dissemination. He and his wife and two children, a boy and a girl both attending Diablo Junior College, lived in Pittsburg. Two married daughters lived in Concord, and one in Vallejo.

After the slander, Stoneking was shunned by his acquaintances, and found himself the object of unfriendly remarks concerning his involvement in the local's difficulties. In addition, he was unable to obtain employment as a carpenter-foreman as he had in the past.

The record amply shows that Stoneking was a man of substantial reputation both within his union and within his community. It was the duty of the jury, of course. to estimate the value of this reputation and to determine in monetary terms the extent of damage done by the widespread republication of Briggs' slanderous statements.

Under the circumstances here presented, it must be concluded that the award rendered was the product of a conscientious and reasonable exercise of the judgment and discretion vested in the jury. Conversely, it cannot be said that the jury was motivated by passion or prejudice.

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 15, 1967. Traynor, C. J., was of the opinion that the petition should be granted.